My name is Brittney Elliott and I represent the appellate in this matter, Ms. Amina Irvin. This case comes to us today from the 1st Circuit in Jackson County, Illinois, where my client filed a 4 count complaint that ultimately proceeded on count 2, which was a claim against the appellate in this matter, S.I.H., for false imprisonment. S.I.H. ultimately moved for summary judgment on that matter, alleging that Ms. Irvin had failed to state a cause of action for false imprisonment. This appeal stems from that order. To state a cause for false imprisonment, there are two required elements. First, the plaintiff's personal liberty or freedom of movement must have been restrained. And second, that restraint must have been unreasonable. To determine reasonableness, there are two things to take into consideration. We look at the government's need to seize against the investigation into one's privacy, but we also look at the nature and the duration of the seizure. Now, usually, and in most cases, probable cause is a question of law. However, whenever the operative... Probable cause for what? Probable cause for the reasonableness to restrain the person. It's S.I.H.'s argument that reasonableness and probable cause go hand in hand. The first element... Probable cause as in criminal probable cause? That is S.I.H.'s argument, Your Honor. And mine is that probable cause and reasonableness are not one and the same. The two elements are that the freedom of... There must have been restraint. That is conceded to. That element is not at issue today. The issue is whether or not the detention was reasonable. S.I.H. argues that it was reasonable because they had probable cause to detain my client. Two days prior to my client going... What kind of probable cause? I mean, she wasn't going to commit a crime. The issue was whether she... I guess suicide is a crime, but... Is that what they're saying? Is there was a criminal probable cause because she was going to commit suicide? They said that reasonableness and probable cause are one and the same. They had... They reasonably... Yes, they had probable cause either under the Terry stop, they say, or probable cause that it was reasonable because she had made or allegedly made suicidal threats at the emergency room. If you look at the record, though, it reflects... Most of their evidence reflects the deposition of Dr. Parks. Dr. Parks was a primary physician that is in no way related to S.I.H. He had seen my client two days prior to her coming to the emergency room. And their arguments reflect... Beside Dr. Parks is simply off of the medical records. The medical records reflect that my client presented to S.I.H. because she had a severe edema in her leg. It was swollen. This is something she has been dealing with for seven years at this time. Didn't her Dr. Parks tell her to go to the emergency room? Yes. And he had told her many times to go, so she went. Yes, she eventually went. Yes. And the record will reflect that my client was under the assumption she was there for her leg. In fact, her intake documents show she is only there for her leg. Was that her complaint? Yes, that was her complaint. Her complaint was not, I'm going to commit suicide. Correct. The reason that Dr. Parks was even contacted was because she said that she was told to present to have an MRI. The emergency room doctor thought that was odd because a physician does not normally tell their patient to go to the emergency room to get an MRI. Apparently, there was a phone conversation between Dr. Parks and the treating emergency room physician, Dr. Bollig, wherein Dr. Parks mentioned to him that two days prior, she had mentioned she had had suicidal ideations. Now, these suicidal ideations are not what SIH would want you to believe. She simply said she was so sick of dealing with this issue with her leg, she was sick of treating with Dr. Parks, that she was about to slit her wrists. This was two days prior. There were phone conversations back and forth with her where she told the doctor that she was going to possibly order a device online to drain the fluid in her leg. But this is all regarding her leg. Slitting her wrists is, in your opinion, not something that should concern a medical service provider that there could be, in fact, suicidal ideations? Certainly. So two days prior, whenever she was frustrated and walked out of the room and said, I'm so over this, I'm going to slit my wrist, she leaves. Her primary physician addresses this. They call her. They speak to her. Not only that, he calls her husband, speaks to her husband. Her husband, a day later, comes in and gets paperwork and documents. Never at any time does her primary physician think she is so serious to mandate and report her. Never. And she was in the care of her husband. So when she presents to SIH, by the way, she is also with her husband. So if SIH had any inclination that she was suicidal, it would stand to reason that they wouldn't detain her if she's in the care of her spouse. Even if SIH had the reasonable or probable cause to keep her there, she is my client's physician that when they told her there was nothing that they could do for her leg, she waited for someone to come get her. She never heard back, and she got dressed and exited herself. She presented to the front desk, even asked if there was any documents she needed to sign. And then she was left to go. In the meantime, Dr. Bollig has security stop her at her car and bring her back in. Of course, she's irate at this point, and the record reflects there's a dispute at this point. Was she told why she has to come back in? My client says she was never told why she was coming back in. She had no idea. And keep in mind, my client and her husband had ridden to the hospital separately. So he had already exited and left the hospital at this time. So she was by herself. They bring her back into the hospital where the Carbondale police are called. She's brought back into her room, and that is when the altercation takes place, wherein she is irate. She's chained to a bed. Does the husband return then at some point? No, the husband had left prior to this to go to work. He was never informed at this time that there may be an issue with your wife. In fact, he testifies that he had never heard his wife say that day at all. He was not concerned about her mental stability whatsoever. He went to work. He left her to go to work. Um, even if you take into consideration SIH, that they had the authority to stop her for a brief detention to investigate. She was in the emergency room in a hospital gown for four hours. She put that hospital gown back on and left. Whenever they brought her back in, they demanded that she get undressed again. And then they demanded she turn over her purse because she was a threat to herself. And then they handcuffed her, didn't they? Yes, and I believe the handcuff was actually, may have been done by the police. However, it's SIH's position that this was all okay because the doctor believed that she was suicidal. I understand that the probable cause in cases, criminal cases, is a matter of law. However, if you look at the poorest case, whenever operative facts regarding the detention are at issue, summary judgment is no longer appropriate because it becomes a question of fact, not a question of law. Here, the operative facts regarding my client's detention, they're completely in dispute. My client says she was never told why she was being detained. She was never informed why she was coming back. Moreover, she says she was never there to even discuss anything about her mental well-being. I believe that there was a conversation with the emergency room physician regarding this device that she had said that she was going to order to drain fluid from her leg. And she was looking into that. Again, she's talking about her leg here. This woman, and if you look at the record, I believe she was carrying in excess of 40 pounds in this leg of fluid. So yeah, she was looking at any and all options. And if you refer to Dr. Parks, he has been treating her for multiple years for this. So yes, she was extremely overwhelmed and impatient with this process. So if we go back and say, okay, they could reasonably stop her for investigatory purposes. It still wasn't reasonable. She was there four hours. She was brought back in. Why did she have to strip back down? Why did they take her purse and lock her up? If she was such a danger, why didn't they do this before? Okay, so let's move on to the probable cause. Before we go there, your client testified that she went to the desk and asked, is there anything I need to sign? And was told, no, just go ahead and leave. That is correct. But then there's other testimony to the contrary that says they told her that she needed to sign paperwork. That's correct. Those are in the medical records. And if you look at the timing of that, it's subjective notes that were written after this all took place. So the timing of those notes are subsequent? Yes. And that's supported by the record as well? Yes. Okay. And it's in the record. So now we have this argument and this argument. Opposite arguments. Disputed facts. As to leaving the hospital. Yes. And you have to leave. Do you agree with me that you have to leave before you can be brought back? Yes. Okay. So it seems to be that we have a question of fact. Yes. And this is your own summary judgment? Yes, Your Honor. Okay. And this argument you made before the court? The same argument? I did not have the trial case in this, Your Honor. Okay, someone, somebody did. Yes, I, there are oral arguments. I'm talking about you meeting Ms. Ervin. Yes. Yes, okay. Yes. And that brings us to the Porras case. Although, if we're going to talk about probable cause, yes, probable cause is generally an issue. It's a question of law, not fact. But as you just said, when the facts of the detention are in dispute, now that becomes a question of fact for the jury to decide. Which case are you referring to? Just so I have it for the... This is the Porras case. Porras. Okay. Now, in support of their argument, SIH relies on three specific cases. One would be the Harris Casino. In this one, again, we're talking about probable cause. We're talking about a police officer. Yes, this is a security guard, but he was acting under the state gaming agent, who was a special agent and a licensed Illinois police officer. And there was no factual dispute in that case regarding the detainment. He was detained. It was for a short amount of time. There was no disputes to that. And he was let go. Is there any inter-involvement with the mental health code in any of this? I know they have pretty stringent requirements as far as how you are able to have somebody detained. And they have to show that they are a threat to themselves or others within a prescribed period of time and that type of thing. Do you think there's any overlap here? No, I do not. And SIH does not make that argument either. I don't believe it. I would think that you might make that argument. That's why I'm bringing that up, because it's very, very difficult to just show up and have somebody detained on a ward on the basis that somebody called in and said they'd been a threat last week. It has to be a very, very specific, imminent threat. And what SIH is going, and in response to that, what I believe SIH is going to say is that in the Chaffetz case, which they rely on, I don't know if I'm pronouncing that correctly, but it says that you can rely on someone else's view of the mental state. So in that case, in the Chaffetz case, they did regard the mental health code. That was at issue. And in that case, they said... They're talking about an involuntary admission. Yes. Yes. So if you're asking me about the mental code, then they're going to argue that no, Dr. Bollig did not necessarily see or observe her being a threat to herself, but he heard it from her primary physician who did two days prior. I want to follow up on what Justice Chapman just asked you. If you have an individual who you believe has suicidal ideations, the mental health code does prescribe very specific circumstances under which you then can detain that person. And you haven't brought that up, although it may raise another question of fact here. So according to the mental health code, yes, if a doctor observes or believes within 72 hours that a patient is of immediate threat to themselves or to others, then they can take action and do an involuntary commitment. Again, none of those factors were present in this case. No, but we're talking about restraint and the deprivation of liberty, which of course we hold as a very high right that we all have. So that's why I brought that up, and I think that's why Justice Cates is referring to it. My response to that would be, even if they did detain her under the mental health code, it would still have to be reasonable. She had been in their care for over four hours with her spouse. But perhaps they didn't follow the mental health code. Exactly. They never alleged that they were trying to have her involuntarily committed. They simply said that we need to have her spoken to by a counselor. So they didn't even follow the procedures. They weren't seeking to have her involuntarily committed. They were just trying to make her stay to speak to a counselor so that they wouldn't be liable in the event that something happened when she left. Well, do people have an obligation to speak to a counselor? That is certainly also a deprivation of your liberty. Right. She refused to. She left. And that is when they brought her back from her vehicle, brought her back in and said that she was now a threat. And this is what resulted. So the counselor part came before she did left. That part of the evidence is true. That is disputed on record. According to the medical records, it is quoted in there that my client walked out of SIH stating, I am not going to speak to a counselor. OK, but that was my question. So somebody asked her to speak to a counselor before she left. That part is true. According to the subjective medical records of Dr. Bowling. What does your client say? My client says no. Then nobody ever asked her to speak to a counselor. That is what she says. Oh, OK. At any time or just before she left? Before she left. Before she left. OK. So that is disputed. So now we have another disputed fact. Yes. OK. Now, SIH is going to argue that these disputed facts are not material to this case. I would disagree. But even if these are not material facts, it is still facts regarding the detention, which according to the Porras case, says that summary judgment is no longer appropriate in that case. Aren't we only talking about detention? I mean, I thought that there was no question that they took her into detention. Yes. They did take her. We are talking about the reasonableness of this. The continued restraint or yes. Right. OK. So they concede that they did, in fact, restrain her. But they say their argument is they had probable cause to restrain her and that it was reasonable. I disagree. Whether or not there was probable cause or reasonableness, I believe they did. This is where I was asking about this probable cause business. Because they didn't, as I understand it, they didn't want to keep her from committing suicide. They were wanting her to see a counselor or some, as you say, make sure they weren't liable in case she did. So I'm trying to figure out how leaving because you didn't see a counselor is equivalent to criminal probable cause. That would be SIH's arguments now. And I'll ask them. OK. You'll have a chance to have some comments after SIH is completed. Thank you. Ms. Jones. So maybe you can answer my last question. I was going to start right there. OK. The elements required to establish false imprisonment are that the plaintiff's partial liberty or freedom of movement must have been restrained. And the second problem is the restraint must have been unreasonable or unlawful. As pointed out by Justice Chapman, the first element is not an issue in this case. What we are talking about is whether the restraint was unreasonable or unlawful. So how is a court, what is the definition? How is that defined in the case law? The case law has equated reasonableness under the false imprisonment with seizures by police, i.e., probable cause. But this wasn't a seizure by police. This was a hospital. Your Honor, in the case of Granger, the court says the elements of a cause of action for false imprisonment are that the plaintiff was restrained or arrested by the defendant and that the defendant acted without reasonable grounds, parentheses, i.e., without probable cause, to believe that an offense was committed by the plaintiff. That's in that case. But that's an offense. Here we don't have an offense. We have somebody who may or may not be a danger to themselves. And, Your Honor, I would submit that the elements are the same. They look to determine reasonableness. Anytime you're detaining someone, you're looking to whether there was the individual had facts and circumstances within their knowledge that would warrant a prudent person or warrant a reasonable caution and believing the circumstances shown that the person should be evaluated by a mental health professional because of a concern that they are a danger to themselves or others. It's the reasonableness. Was that the case you just read from? Pardon? No, Your Honor. That's your brief. That's my, well, that's using the language, you know, basically taking the probable cause standard when it comes to committing an offense and applying it to the appropriate circumstance, which is, in this case, making sure that the patient who the doctor has reasonable belief might be a danger to herself or to a danger to others, detains her long enough to have the mental health evaluation that's required under the Mental Health Code to make a determination whether this person should be involuntarily committed. But they have to have a right to do that to begin with. Well, Your Honor, I'd like to point you to the case that I cite, which is Chantis versus Smith. That case involved the situation we're talking about now. In that case, it involved police officers who were trying to basically involuntarily commit one of their fellow police officers, but it all had to do with whether the person was mentally. We have an involuntary commitment here. That's my question and my concern. Because it seems to me that part of the concern that the hospital had is that they might be subject to a suit. And how does that play into any kind of right that they have to detain somebody, a liberty interest of somebody? Well, Your Honor, we never got to the involuntary commitment proceeding because she refused to allow, or we were waiting to get the cornerstone mental health professionals to come and evaluate her in order to determine whether she was subject to involuntary commitment. I'd also like to bring the Court's attention to a very recent case. It's the Coleman versus Proveno Hospital's case, which you're probably familiar with. That's the case where the hospital didn't search a patient. He pulls out a gun, points it at a cop, and gets shot. Hospital in suit. And that's what we're talking about. That's what I'm talking about. It has long been recognized that hospitals are under a duty to exercise reasonable care to protect their patrons from harm. There we go. This case, it is the proposition that they have a duty to make sure that this person is not a threat to themselves or others if they have reasonable... Reasonable, there you go. If they have information that would lead a person, put a person along with reasonable caution believing that this person is a threat to themselves or others. And therein lies, excuse me, therein lies the issue. Reasonable. I would like to go through the facts of this case. Well, we would like you to go through the facts too, but here's the issue. You have one lady who says, look, nobody ever told me to seek counsel. And then you have notes that are written after the whole thing occurred that says, yeah, we wanted her to seek counsel and she wouldn't seek counsel. You don't see why he's raising a question of fact? No, Your Honor, because the undisputed facts in this case support the conclusion that the doctor in this case had information that would lead him, a reasonable professional in his position, to believe that she might be a danger to herself or others. And as a result, it was appropriate for, reasonable for them to detain her for a short period of time in order to have her evaluated by a mental health professional to determine whether she needed counseling, either on an outpatient or an involuntary commitment purposes. Now, let me ask you now, excuse me, I get to ask the question. What you just said, what you just told us, was that written into the record at the time the doctor saw the patient or after? Your Honor, there's testimony from Dr. Parks with regards to communications. Dr. Husson, Dr. Bolick has made entries into the chart with regards to the communications he had with the patient prior to her leaving, after she left. But my question is, what you just told us about what he knew that she might be a threat to herself, were those written at the time that he was making his initial notes about knee and everything else? Or were those on the document afterwards? It was all at the same time as he was making notes with regards to his evaluation. So it wasn't the very first time that he saw this patient? It was, he saw her twice and both times before she left the hospital and was returned by security that he made those notes. Well, the second note, isn't it true the second note was because of the phone call that the plaintiff made to Dr. Parks and then Dr. Parks made the call back to Dr. Bolick? Isn't that why he went and saw her a second time? Or do I have the facts wrong? Well, both of those times, Your Honor, occurred before she was detained. I understand, but the first time he saw her, he didn't know anything about suicide. But she thought she was getting an MRI, right? And so she didn't get an MRI, so she's the one who called Dr. Parks and then Parks called Bolick. Well, Your Honor, Dr. Parks had called the emergency room prior to Dr. and spoke to Dr. Haig about this patient and sending her and Dr. Bolick's records reflect that she was sent to the emergency room for evaluation of her leg. But Dr. Parks agreed that the primary reason she was sent was for a mental health evaluation. But then she's in dispute with the plaintiff. The plaintiff disputes that. What the plaintiff's perception of what was going on, why she was there, is not a material fact. There is a dispute. She says I was sent for my leg. Why is it not a material fact? It's not a material fact because the focus of the cause of the reasonableness inquiry is based upon what knowledge did the person who was having her detained have. What do we have on the record with regard to that? With regards to what, Your Honor? What knowledge the hospital had. I'll go through the facts if you'd like. If you would quickly summarize. Okay. She was seen. Do we have Dr. Parks testimony? Correct. He testified with regards to everything that is put in here. He had office notes with regards to these matters and he testified with regards to his contacts with the emergency room. His contact was on August 2nd, which was three days before she had an office visit with him. As she was leaving the doctor's appointment on that day, she told a nurse that she was ready to give up and felt like slitting her wrists. So when Dr. Parks gets a message from his nurse the next day, on August 13th, he asked the nurse to contact another nurse to contact the plaintiff and offer intervention if suicidal. He also told the nurse to say that it would be best for her husband to drive to the emergency room for evaluation. The nurse contacted the plaintiff and in response, the plaintiff is identified by the nurses and reconfirmed that she was serious about her threats. She was encouraged to go to the emergency room but refused. Then she stated she read online how she could cut herself to release the fluid. So now we're looking at self-mutilation in addition to suicide. So was the hospital alerted before she arrived? Your Honor, the facts go on to explain that the doctor then talked to the husband. I know that. I know those facts. So to answer my question, which was did anyone call the hospital and say before she arrived, the plaintiff is coming here and, you know, she says we told her she ought to get an MRI but the other reason or the real reason we want her there is to be evaluated as a suicidal risk. When she did, did you answer my question? I'm about to, Your Honor. Okay, I'm sorry. When she finally agreed to go to the hospital on the 15th at about 1.37 in the afternoon, Dr. Potts testified that he did call a report to Dr. Haig. Okay, and now was this before then she arrived? Correct. Okay. And she was told to ask for Dr. Haig when she got there and she did in fact ask for Dr. Haig but at that point, Dr. Bullock was the doctor on call in the emergency room. At 5 p.m., plaintiff called Dr. Parks and stated that she was frustrated that the ER doctor was not helping her. So Dr. Parks, and she asked Dr. Parks to call the emergency room and get a report to the emergency room physician. He called and when he did, he told Dr. Bullock about everything that had transpired, about the reports of suicide, the reports of reaffirmation of that, the concern he had about telling the husband to remove knives and guns from the house, to not leave her alone, the contact that... We only know this through Parks' testimony though. And it's undisputed, Your Honor. There is no dispute with regards to this testimony as to what was told. And it is confirmed by... And in that report, Dr. Parks further testified that he sat the plaintiff to the emergency room because he was concerned about her life and also concerned about her well-being from a psychiatric standpoint. He spent two days trying to get her to the emergency room for a mental health consult. Now he's able to get her to the emergency room not only for a leg condition but for that mental health consult. Okay, so now we arrive at the point I've asked you about before, which is your Dr. Bullock says, this is what I knew. I wanted her to see a counselor. She says, no, that's not why I left the hospital. I didn't leave the hospital because of that. So why doesn't her testimony... Because they never would have restrained her but for your guy's testimony. Well, Dr. Bullock's testimony is the sole reason that they detained her. She disputes that testimony. Well, Your Honor... What do you disagree about? I don't understand. When the... When you said that... She said that she was sent to the hospital for a leg injury or for an evaluation. Okay. That's immaterial to the question of what did Dr. Bullock know... I agree with you. ...or she knew at the time that he told the security guards, go out and bring her back. She needs to be evaluated by a mental health professional. Well, I don't agree with everything you're saying. I don't want to argument the thing I do. But I do agree that as to what she says, she needed an MRI. That's not important. What was going on in Dr. Bullock's mind when he said, go get her, or whoever said, actually it was a nurse who went off and got her. My point is, if your doctor said, this is what I knew. I needed her to see a counselor. She refused a counselor. But the plaintiff says, that never happened. Don't we have a question of fact? No, Your Honor, because those facts are immaterial. What she perceived and what she... I mean, the case law is... She's saying that it's not true. The offender's perception of the circumstances is not sufficient to defeat probable cause. No, but she's saying that the fact is not true. What fact is not true? What Dr. Bullock was saying. That he wanted her to see a counselor. She's saying, that never happened. Doesn't she have a right to plead an affirmative defense to that? When she... What her perception of the reasons why she was being detained. She says she wasn't told why she was being detained. And of course, the testimony or the medical records reflect, she knew exactly why she was being detained. And Dr. M's... The security guard testified that she knew exactly why she was being detained. That's a decision. What she's told afterwards... No, what she's told afterwards, again, may or may not be relevant. My point is, she's saying that the testimony of the doctor, as to his reason for detaining her. The reason he went and got her. Your Honor, I... But she says, that never happened. How is that not relevant? It is not relevant because they never had to tell her in the first place why she was being detained. Does a police officer have to tell a person why they're being arrested, when they're being arrested? The answer is, yes. So, hospital consent of a security guard out to anybody, to bring them back and handcuff them to where they want to go to bed. Your Honor, that was more than just Dr. Cox's conversation with Dr. Bullock. Dr. Bullock said... The medical records reflect that she was... She made a statement about the fact that they had drained her leg. And Dr. Bullock's note says, that when he confronted the patient with this prior statement of suicide, she was coined at saying that she had to live with the chronic leg problems. She would do whatever needed to be done. The plaintiff's testimony with regards to that is, of course, she denies that she was ever confronted. But then she says, the plaintiff stated that he took that to mean that I was going to put a drain in myself. Well, no, of course not. So, based upon her own testimony, she understood that her statements that were being made to Dr. Bullock, led him to conclude that she might be a risk of harm to herself or others. Your Honor, the reason her, you know, they raise three matters that they say are disputed facts. One is why she was sent to the emergency room. The case law says that facts unrelated to the essential elements of plaintiff's cause of action are immaterial. And regardless of how sharply conconverted their presence in the record will not warrant denial of the motion for summary judgment. This case, the issue is whether facts and circumstances within the hospital's knowledge and in which they have reasonably trustworthy information, sufficient to warrant a prudent man in believing that the plaintiff might harm herself and be, should be detained for a mental health evaluation. That is what we're talking about. The, whether she was, whether she misunderstood or had a different perception of why she was sent to the emergency room, whether she was told she could leave before being brought by security personnel and whether she was ever told why she was being detained are not relevant, are not material facts to that issue. The material facts concerning, while you're reading from your brief or some case, your argument. The material fact that matters are those with regards to what knowledge the doctor would have with regards to the potential threat or potential that she would be a harm to herself, either from suicide or self-mutilation, cutting her leg and letting the fluid drain out. But the second prong of that test pertains to the entire detention, which was about probably no more than 10 minutes, Your Honor, because she left, the records reflect that she left around 7 p.m. The security guards were called at 7.20 to bring her back into the hospital. But up until 7 o'clock, her, her presence in the emergency room was completely gone. I'm talking about how she was ultimately handcuffed to a bed. She was ultimately arrested because she bit a cop. And was convicted of that before. Well, was that before? Was she handcuffed before she bit the cop?  During the time that you're trying to. But we're still talking about right around 7.30 when she was, was resisting them taking her purse. Right. She bit a cop, was arrested, and ultimately was convicted of battery. And this, this court. That was dismissed, wasn't it? No, Your Honor, she was convicted of battery. Okay. And this court affirmed that conviction last week, the week before last. Because that conviction was appealed and that was affirmed. This was affirmed last week? Week, either last week or the week before last. The conviction, the battery conviction was affirmed by this court. And I believe Justice Welch wrote the opinion. So we're looking at a time period of around 10 minutes. At most, 30 minutes that she was detained. And during that time period, they were trying to get her cooperation with placing her back in a gown, a paper gown. And her purse being taken from her and locked up for safety reasons. Pursuant to the hospital policy with regards to patients they believe are, are potentially suicidal. So we're talking. How long was she detained? She was detained no longer than a half hour and most likely only 10 minutes. Because the record reflects and the testimony is that she was stopped in the parking lot at 7.20 and she was arrested by the police around 7.30. And she left within police custody after being, after the assurances by the police that they had suicide watch at the jail at around 8.06. So I have one more question. I want to go back to this issue of what your Dr. Bollig knew. Dr. Bollig knew all of these facts and he really just wanted her to be seen by a mental health counselor. If she had agreed, none of this would have happened. Correct. So the fact that she says, this never happened, that he never asked me to do this, that nobody ever prevented me from leaving until they came after me. You don't see that as a material fact? No, Your Honor, because the. Well, okay. I just, I just wanted your answer because the time is up. So I'm sorry about that. Okay. Do you have a comment? Okay. Thank you for your argument, Ms. Jones. In summary, we're here on a motion for summary judgment. Clearly there are facts in dispute. For argument's sake, let's say Dr. Bollig did have the knowledge required to detain her. It doesn't stop there. It's whether or not it was reasonable and it's not just the time. It's also the nature of the detention. So it may have been 10 minutes, but keep in mind this is after she had been there for close to four hours with her spouse. She had been undressed in a gown. She had had vitals taken. She had been examined by nurses and a doctor twice. Let me ask you, was the husband ever alerted to the fact that the primary reason that she was there was for a mental health evaluation? No. Because it does seem inconsistent or incongruent that he would have just left and gone to work if in fact there may have been not only a mental health evaluation, but probably a commitment. Right. So like I was saying, it's not just the time and the duration. It's also the nature. So even though it may have been 10 minutes or 30 minutes, they made her, they physically brought her back in. She was mandated to take off her clothes and put back on a gown, which she had already taken off. And now they've decided we're going to take away her purse and everything else, even though she sat there with her purse for four hours. If in fact that Dr. Bullock did the medical records, let's take them for true. If you will look, Dr. Bullock apparently signs a release stating that I have viewed the patient and she is able to be sent off to jail. While the arresting officer testifies otherwise, Dr. Bullock never even appeared after he made the phone call to the security guards. Now in his notes and the medical records relied upon by SIH, he states that when my client came back in, she was aggressive. She cussed at him and she threatened him. But the officer that she has been alleged to have been testified that this doctor never even came back in. Therefore, because all of these factual disputes, summary judgment is not appropriate in this case. This case needs to be heard on the merits so that it can be determined whether or not this was in fact a reasonable detention. Thank you. Thank you. Okay, we're going to take a short recess. Thank you for your arguments, ladies. Excellent job. This matter will be taken under advisement. We will issue an order in due course. Okay.